GEORGE A. DAVIS, INC.

v.

CAMP TRAILS COMPANY, Johnson
Wax Associates, Inc. and Ma-
guire/Lemay Associates, Inc.

Civ. A. No. 77–1852.

United States District Court,
E. D. Pennsylvania.

March 23, 1978.

Ralf E. Gilbert, Morrisville, Pa., for plaintiff.

Manuel A. Spigler, Philadelphia, Pa., for Camp Trails.

Steven R. Waxman, Philadelphia, Pa., for Maguire/Lemay.

## OPINION

LUONGO, District Judge.

George A. Davis, Inc., a Pennsylvania corporation, brought this diversity action against three other corporations, seeking to recover damages for (1) breach of contract, (2) disparagement, or "trade libel," and (3) intentional interference with contractual relations. Two of the defendants, Johnson Wax Associates, Inc., a Delaware corporation, and its wholly-owned subsidiary, Camp Trails Company, also a Delaware corporation, move to dismiss the complaint for failure to state a claim. Fed.R.Civ.P. 12(b)(6). The remaining defendant, Maguire/Lemay

Associates, Inc., a Massachusetts corporation, moves to dismiss the complaint on a number of grounds, including lack of personal jurisdiction, improper venue, and failure to state a claim. Fed.R.Civ.P. 12(b)(2), (3), (6). For the reasons hereafter stated, I conclude that the contract claims must be dismissed as to Johnson Wax Associates, and that the entire complaint must be dismissed as to Maguire/Lemay Associates.

### JOINT MOTIONS OF CAMP TRAILS AND JOHNSON WAX

For the purposes of these motions to dismiss, the well-pleaded factual allegations of the amended [1] complaint must be taken as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam); 2A Moore's Federal Practice ¶ 12.08 at 2266–67 (2d ed. 1948). So considered, the facts in this case may be summarized as follows: Through an exchange of letters in June of 1966, the plaintiff, George A. Davis, Inc., entered into an agreement with Camp Trails, a division of Mechanical Products Company (an Arizona corporation), pursuant to which plaintiff became the "exclusive sales representative and manufacturer's agent in and for all New England and Mid-Atlantic States, Maryland, and Washington, D. C.," for Camp Trails' line of backpacking and camping equipment. Complaint ¶ 3. Plaintiff was to receive a commission "on all backpacking equipment sold by it or [by] others" in its exclusive territory. *Id.* ¶ 4. The agreement was terminable by either party on sixty days' notice. Several years later, Camp Trails Company, a wholly-owned subsidiary of defendant Johnson Wax Associates, Inc., assumed the obligations (under this agreement) of Camp Trails, a division of Mechanical Products Company. *Id.* ¶ 3.

Count I of the complaint, which sounds in contract, is based on the following additional facts. By a letter dated May 27, 1976, defendant Camp Trails Company (hereinafter Camp Trails) terminated its agree-

---

1. The original complaint was filed on May 26, 1977. On August 12, 1977, in response to the defendants' various motions to dismiss, the plaintiff filed an amended complaint. This amendment was proper under Rule 15(a).

ment with the plaintiff "effective June 30, 1976," in violation of the sixty-day notice provision, "thereby wrongfully preventing [the plaintiff] from approaching prospective new customers and earning additional commissions and rights to commissions . . for the full 60 days after notice of termination." *Id.* ¶ 5. The next day, again by letter, defendant Camp Trails modified the termination by agreeing to pay commissions to the plaintiff on orders that Camp Trails received by August 31, 1976. Exhibit C to Complaint. This arrangement "terminate[d] effective August 31, 1976 [the plaintiff's] right to commissions on all orders from the customers procured by" it for Camp Trails. Complaint ¶ 6. After August 31, 1976, defendant Camp Trails and Johnson Wax wrongfully "refused to pay to [the plaintiff] commissions on orders taken by [defendant Camp Trails] from those customers originally procured by [the plaintiff]," and "refused to compensate [the plaintiff] for the value of [its] efforts and [its] success in building up the Camp Trails product line in [its] territory." *Id.* ¶¶ 9, 10.

Count II of the complaint, which also sounds in contract, is based on the failure of defendants Camp Trails and Johnson Wax to pay to the plaintiff "commissions due from sales made in the State of New Jersey by one Mel Mittler, the New York City Representative, during the period beginning the summer of 1972 and continuing through and beyond January 1, 1973 when Camp Trails did unilaterally reform [the plaintiff's] territorial privileges." *Id.* ¶ 12.

Count III of the complaint, which sounds in tort, is based on a letter circulated in June of 1976 by defendants Camp Trails and Johnson Wax that was "understood by members of the trade to imply false and defamatory judgments concerning an unsatisfactory change in the quality of services performed by [the plaintiff]." *Id.* ¶ 14. This letter, in conjunction with false statements made by defendants to Camp Trails' customers, caused the plaintiff "to suffer damage to [its] business reputation among these many firms of the trade and loss of goodwill." *Id.* ¶ 15.

Count IV of the complaint, which also sounds in tort, is the only count that also runs against defendant Maguire/Lemay Associates, Inc., the firm that succeeded the plaintiff as Camp Trails' agent and representative. The complaint alleges that the three defendants maliciously performed certain acts in furtherance of a conspiracy to deprive the plaintiff of its employment with Camp Trails and to cause Maguire/Lemay Associates to succeed the plaintiff in that capacity.

## COUNTS I AND II

■ With respect to counts I and II of the complaint, which sound in contract, Camp Trails initially argued that the plaintiff contracted in 1966 with the Camp Trails division of Mechanical Products Company, rather than with defendant Camp Trails Company, which was formed in 1972. Joint Memorandum of Law (Document No. 5) at 5–6. "Without some allegation tying defendant Camp Trails . . . to the earlier agreement, no claim can be sustained against it on either Count I or Count II . . ., both of which allege breach of the 1966 agreement." *Id.* 6. However, the plaintiff has since filed an amended complaint that explicitly alleges that defendant Camp Trails assumed "all obligations" under the contract. Complaint ¶ 3. The argument is thus unavailing.

Defendant Johnson Wax further argues, with respect to counts I and II, that it entered into no contract with the plaintiff and that it cannot be held liable for any breach of contract committed by its wholly-owned subsidiary, defendant Camp Trails. Joint Memorandum of Law (Document No. 5) at 3–5. The plaintiff, conceding that Johnson Wax was not a party to the contract in issue, nevertheless urges that defendant Camp Trails was and is a "mere instrumentality" of its parent corporation, Johnson Wax, and that Johnson Wax therefore may properly be held liable on that contract. Memorandum of Law in Opposition to Defendants' Joint Motion (Document No. 12) at 2–4.

Ordinarily, of course, a stockholder is not liable on contracts entered into by the corporation, even where that stockholder is the parent corporation and owns all outstanding shares in the subsidiary that entered into the contract. *See* 13A W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 6213, 6222 at 33 (1961 ed.). The plaintiff contends, however, that the so-called "instrumentality rule," often traced to *Lowendahl v. Baltimore & O. R. R.*, 247 App.Div. 144, 287 N.Y.S. 62, *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936), permits a court to pierce the corporate veil and impose liability on the parent corporation for the debts of a subsidiary that is a "mere instrumentality" of the parent. Johnson Wax, by way of response, argues that the "instrumentality rule" applies only where the subsidiary corporation has engaged in fraudulent, tortious, or criminal conduct, as distinguished from simple breach of contract.

In resolving this issue, I "start from the general rule that the corporate entity should be recognized and upheld, unless specific unusual circumstances call for an exception." *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir.) (citation omitted), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1967); *see Technograph Printed Circuits, Ltd. v. Epsco, Inc.*, 224 F.Supp. 260, 263–64 (E.D.Pa.1963). Thus, absent a compelling basis for departing from the general rule, Camp Trails, the corporation, rather than Johnson Wax, the sole shareholder, is liable for any breach of contract. In the Third Circuit's formulation, "the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Zubik v. Zubik, supra*, 384 F.2d at 272 (citations omitted).[2] The plaintiff, however, does not attempt to bring the present action within this formulation; it alleges no fraud, no illegality, no undercapi-

talization, nor anything else to distinguish this case from the garden-variety contract case. Nor does the plaintiff cite a single decision in which, despite the absence of fraud or illegality, the "instrumentality rule" was applied to allow recovery against the parent corporation on a contract entered into by the subsidiary.

Under the circumstances, this case is controlled by *Chengelis v. Cenco Instruments Corp.*, 386 F.Supp. 862 (W.D.Pa.), *aff'd mem.*, 523 F.2d 1050 (3d Cir. 1975). The plaintiffs in *Chengelis* entered into three contracts, including a royalty agreement, with Chemlime Corporation, which they knew to be a wholly-owned subsidiary of Cenco Instruments Corp. Following an alleged breach of the royalty agreement, they brought a diversity action against Cenco, the parent corporation, arguing that Chemlime was merely Cenco's "alter ego." Judge Weber, apparently applying Pennsylvania law, wrote:

"There is abundant evidence in the record to show a close relationship between Cenco and Chemlime. We do not reach the question of whether the evidence is sufficient to establish the 'alter ego' relationship argued for by plaintiffs, however, because there is no proof that the corporate form of the subsidiary was used by the defendant to perpetrate a fraud or promote an injustice akin to fraud. Absent the element of fraud or injustice akin to fraud, we cannot disregard the corporate structure of Chemlime and impose liability on its parent, Cenco. . . .

There is no allegation in the instant case that Chemlime was acquired by Cenco with the intention of its misuse to plaintiffs' detriment. There is no proof that at the time Chemlime executed its agreements with plaintiffs Cenco concealed its relationship with Chemlime or used its control over Chemlime to defraud or deceive plaintiffs. There is no evi-

2. *See also In re Sugar Industry Antitrust Litigation*, No. 77–1555, slip op. at 12 (3d Cir. March 6, 1978) (subsidiary treated as alter ego of parent corporation where adoption of "any other view would invite evasion [of the antitrust laws] by the simple expedient of inserting a subsidiary between the violator and the . . . purchaser.")

dence that Cenco had any specific corporate opportunities in mind which dictated the form of Chemlime's agreements with plaintiffs. Conversely, the evidence shows that plaintiffs executed a contract which bound only the subsidiary and not the parent corporation notwithstanding plaintiffs' knowledge of the interrelation of the two. We can find no obligation of Cenco . . . to insure plaintiffs' receipt of royalty payments under their agreement with Chemlime."

386 F.Supp. at 865.

Based on this approach to the so-called "instrumentality rule," Judge Weber entered judgment for defendant Cenco following a nonjury trial; the court of appeals affirmed without opinion. 523 F.2d 1050 (3d Cir. 1975).

True, the present action is before me on a pretrial motion to dismiss, whereas in *Chengelis*, Judge Weber had the benefit of a factual record developed at trial. Nevertheless, as noted earlier, the complaint here is utterly devoid of allegations that, if proved, would support application of the "instrumentality rule" to Johnson Wax. *Cf.* Fed.R.Civ.P. 9(b) ("In all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity."). Dismissal under Rule 12(b)(6) of counts I and II of the complaint as to Johnson Wax is therefore appropriate. This dismissal is without prejudice to the plaintiff's right to file an amended complaint containing further allegations pertinent to the application of the "instrumentality rule" in this case.

### COUNT III

With respect to count III of the complaint, which sets out a claim for disparagement, or "trade libel," Camp Trails and Johnson Wax again seek dismissal for failure to state a claim. Their position is simply that the complained-of letter sent to Camp Trails' customers "could not be found to be libelous under any possible set of facts." Joint Memorandum of Law at 3. The letter, sent by J. Kevin Newman, Camp Trails' sales manager, reads as follows:

"June/1976

Dear Camp Trails Dealer:

Effective June 30, 1976, George A. Davis, Inc., of Levittown, Pennsylvania, will no longer be representing Camp Trails Co. in your area. Our association with the George Davis group has extended over many years and we regret having to make this change at this time.

Please send any fill in orders directly to our Phoenix factory since the stock from Mr. Davis' Levittown warehouse will be shipped back out to us sometime in the month of June.

As you are aware, any shipments from Phoenix will be "Full Freight Allowed" on shipments totalling $1,000 at cost. We will let you know as soon as the new representative for your area is selected. In the meanwhile, if you have rush orders to place please call us collect.

Sincerely,

s/ J. K. Newman

J. KEVIN NEWMAN

Sales Manager

JKN/pc"

The defendants contend that this letter is non-libelous as a matter of law, but I need not pass on that contention in view of the following allegation, which is contained in the amended complaint:

"15. Such letter was received by all customers of Camp Trails in plaintiff's territory and as a consequence of oral statements made by Defendants elaborating on the termination falsely saying 'they were fired because they did not do the job,' did cause Plaintiff to suffer damage to his business reputation among these many firms of the trade and loss of goodwill."

Assessment of the alleged "oral statements" must be left to the trier of fact. Accordingly, the motion to dismiss will be denied as to count III.

### COUNT IV

Count IV sets out a claim for the tort of intentional interference with contractual relations. The defendants seek dismissal of

this count for failure to state a claim, arguing that "[a]lthough tortious interference with a business relationship is recognized in Pennsylvania, it is not a claim which can be made by the parties to the contract against each other." Joint Memorandum of Law at 1. Apparently assuming that both Camp Trails and Johnson Wax were parties to the contract with the plaintiff, the defendants contend that the complaint "fail[s] to state a claim upon which relief can be granted *against the defendant corporation* [Camp Trails] *and its shareholder* [Johnson Wax]." *Id.* 2 (emphasis supplied). The plaintiff, by way of response, maintains that, "[c]ontrary to defendants' argument, tortious interference with a business relationship is a claim cognizable in Pennsylvania which may be made by one party to a contract against another party." Memorandum of Law in Opposition to Joint Motion at 2.

Insofar as count IV seeks redress for Camp Trails' interference with the contractual relationship *between Camp Trails and the plaintiff*, it plainly fails to state a claim. *See* W. Prosser, Torts § 129 at 934 & n.9 (4th ed. 1971); Restatement (Second) of Torts § 766 (Tent. Draft No. 23, 1977) (by implication); Restatement of Torts § 766 (1939) (by implication). "[N]o person or company can be guilty of 'inducing' himself or itself to breach his or its own contract." *Allison v. American Airlines, Inc.,* 112 F.Supp. 37, 39 (N.D.Okla.1953). With respect to Johnson Wax, however, which was not a party to the 1966 agreement, an action might well lie for interference with the contractual relationship *between Camp Trails and the plaintiff.* In any event, as I read count IV, which is less than pellucid, the plaintiff seeks redress only for interference with its existing and prospective business relations with "clients in the camping and backpacking trades." Memorandum of Law in Opposition to Joint Motion at 1. I must therefore determine whether count IV states a claim under Pennsylvania law against either Camp Trails or Johnson Wax.

Relying on *Sherman v. Weber Dental Mfg. Co.,* 285 F.Supp. 114 (E.D.Pa.1968), Camp Trails argues that the plaintiff cannot maintain this tort claim against it. Briefly, *Sherman* arose when the defendant, a manufacturer of dental equipment, terminated Sherman's distributorship. The complaint alleged violations of the antitrust laws, as well as interference with contractual relations. Prior to trial, Judge Kirkpatrick determined that the latter theory was unavailable to Sherman, stating, in the language emphasized by Camp Trails:

"The plaintiff's claim of interference with contract relations must fail in that the law of Pennsylvania is clear that a promissor cannot sue his promisee or vice versa for interference with the plaintiff's business relationship with third parties where the claimed interference amounts to nothing more than a breach of the contract. *Glazer v. Chandler,* 414 Pa. 304, 200 A.2d 416 (1964)."

285 F.Supp. at 116.

The plaintiff, relying on *North Carolina Mut. Life Ins. Co. v. Plymouth Mut. Life Ins. Co.,* 266 F.Supp. 231 (E.D.Pa.1967), argues that the Supreme Court of Pennsylvania's opinion in *Glazer v. Chandler,* 414 Pa. 304, 200 A.2d 416 (1964), admits of a narrower interpretation than it was given in *Sherman.* Briefly, *North Carolina Mut. Life Ins. Co. v. Plymouth Mut. Life Ins. Co.* arose out of a reinsurance contract under which Plymouth was to underwrite certain policies issued by North Carolina. In particular, Plymouth was to bear any and all costs connected with the subject policies. As it developed, however, Plymouth "did not inform plaintiff that claims had been made by attorneys and complaints filed against plaintiff with the insurance departments of some of the states [in which policies had been issued]." 266 F.Supp. at 233. In its complaint, which sounded in both tort and contract, North Carolina alleged "that defendant failed to properly handle claims of its insureds, and because of this [plaintiff] was put to a great expense in finally disposing of these claims which should have been done in the first instance by defendant." *Id.* Plymouth, relying on *Glazer v. Chandler, supra,* sought to dismiss count IV of the complaint, and the court wrote:

"This count states a claim for the tort of intentional interference with prospective business advantage. [Citation omitted.] It alleges that defendant breached its contract with plaintiff, that the breach was made with the intention of causing harm to the plaintiff's business, and that harm in fact occurred and will continue to occur in the future. Defendant cites *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416 (1964) in opposition to this claim. *Glazer* held that mere breach of contract which has the incidental effect of injuring plaintiff's business relations with others is not a sufficient basis for this tort. However, plaintiff's injury was not merely incidental, rather it claims that the breach was made with the intent to destroy plaintiff's good will and reputation. This is the gist of the tort. Most of the decisions have turned upon the defendant's motive or purpose. A breach made because the defendant thinks he has made a bad bargain, even though intentional, does not support this cause of action. But where the underlying motive is purely malevolent, a desire to do harm to the plaintiff for its own sake, the elements of the tort are stated. [Citations omitted.] The existence of this tort is recognized in Pennsylvania. [Citations omitted.] Where malice and wanton conduct are alleged, punitive damages can be recovered. [Citation omitted.] The motion to dismiss this count, therefore, must be denied."

266 F.Supp. at 234.[3]

In order to accurately appraise the significance of *Glazer v. Chandler* for the present action, a brief statement of the facts of that case will be helpful. Glazer, a residential builder, agreed to buy some building lots and certain sewer rights from Chandler, another residential builder. The written agreement of sale provided that half the purchase price was to be secured by a purchase money mortgage (covering some of the lots) payable *within two years* of the settlement date, and it "further provided that each lot would be released from the lien of said mortgage upon payment of $1,000." 414 Pa. at 306, 200 A.2d 417. The parties executed a mortgage "purportedly in accordance with the agreement of sale," *id.*, but this provided that it was payable at the *end* of two years from settlement, and it failed to provide for the release of each lot upon partial payment. "Glazer made numerous efforts to fully pay the mortgage . . . but Chandler refused to satisfy [it]," even after the two years had expired. *Id.* This prevented Glazer from receiving settlement proceeds. In addition, the sewer rights expired and reverted to the Borough of Brookhaven before the mortgage was ultimately satisfied; Glazer was thus unable to sell them.

"In addition, Chandler improperly removed the deed to the building lots from the title company and refused to redeliver it, thereby occasioning [the Borough's] refusal to grant Glazer building permits. Chandler ignored requests for redelivery of the deed and Glazer was obliged to institute an action to obtain title to the properties. The deed was subsequently redelivered.

Chandler misrepresented that he had an approved and recorded plan of subdivision of the lots. As a consequence, Glazer was required to accept a less desirable plot plan and obtained Borough approval only after considerable delay. Chandler also misrepresented that rough grading had been done on certain roads involved in the agreement. Chandler wrongfully insisted that the title company hold $16,000 in escrow for certain road assessments. Without basis Chandler threatened to seek an injunction against the title company."

414 Pa. at 307, 200 A.2d at 417.

Glazer obtained a jury verdict in trespass for the tort of interference with contractual relations, and Chandler appealed from the denial of his motion for judgment n. o. v. The Supreme Court of Pennsylvania reversed. Justice Cohen, writing for a unanimous court, stated the facts and continued as follows:

3. *See also Behrend v. Bell Tel. Co.*, 53 Pa.D. & C.2d 421, 430 (C.P. Allegheny County 1971).

"The tort of inducing breach of contract or refusal to deal is defined as inducing or otherwise causing a third person not to perform a contract with another, or not to enter into or continue a business relation with another, without a privilege to do so. Restatement, Torts § 766 (1939). Numerous cases in this Commonwealth are in accord with this definition. [Citation omitted.]

Every case in Pennsylvania granting recovery for this tort has involved a defendant's interference with known contracts or business relations existing between *third persons* and a plaintiff. [Citations omitted.] Our courts have also indicated that there may be recovery under this tort theory where a defendant has interfered with prospective contracts or business relationships of third parties with a plaintiff. [Citations omitted.]

However, where, as in this case, the allegations and evidence only disclose that defendant breached his contracts with plaintiff and that as an incidental consequence thereof plaintiff's business relationships with third parties have been affected, an action lies only in contract for defendant's breaches, and the consequential damages recoverable, if any, may be adjudicated only in that action.

To permit a promisee to sue his promissor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. [Citation omitted.] The methods of proof and the damages recoverable in actions for breach of contract are well established and need not be embellished by new procedures or new concepts which might tend to confuse both the bar and litigants."

414 Pa. at 307–09, 200 A.2d at 418 (footnote omitted).

■ Does *Glazer v. Chandler*, then, require dismissal of the plaintiff's claim against Camp Trails for interference with business relations between the plaintiff and other firms in the camping and backpacking equipment trades? I conclude that it does not. As the late Judge John W. Lord noted in *North Carolina Mut. Ins. Co. v. Plymouth Mut. Life Ins. Co., supra, Glazer v. Chandler* presented the situation where "the allegations and evidence only disclose that defendant breached his contracts with plaintiff and that *as an incidental consequence thereof* plaintiff's business relationships with third parties have been affected." 414 Pa. at 308, 200 A.2d at 418 (emphasis supplied). To allow the tort action in that situation, as Justice Cohen stated, would be to allow the recovery of contract-type consequential damages in a new guise.[4] This the court firmly declined to do. In a case such as the present one, however, where additional allegations are present, the rationale of *Glazer v. Chandler* has little, if any, force. Here, the plaintiff alleges that the decisions to terminate the plaintiff, replace it with defendant Maguire/Lemay Associates, and announce the change through an allegedly false and injurious letter were "without legitimate cause or justification, but were motivated solely by malice toward [the plaintiff] with the intent to injure [the plaintiff] in [its] livelihood." Complaint ¶ 20. The mental state described in these allegations, if not quite "the gist of the tort" for which the plaintiff seeks redress, is at least the mental state often regarded as justifying the imposition of liability under this theory. *North Carolina Mut. Life Ins. Co. v. Plymouth Mut. Life Ins. Co., supra,* 266 F.Supp. at 234; *see, e. g.,* Restatement (Second) of Torts § 766, Comments j, r, & s (Tent. Draft No. 23, 1977); Carpenter, *Interference With Contract Relations,* 41 Harv.L.Rev. 728, 734–37 (1928); Sayre, *Inducing Breach of Contract,* 36 Harv.L.Rev. 663, 672–86 (1923). In short, I cannot say at this stage that this is a case "where the claimed interference amounts to nothing more than a breach of

4. Cf. *United States v. Newbury Mfg. Co.,* 36 F.Supp. 602, 605 (D.Mass.1941) ("A breach of

contract, however deliberate or intentional, does not become a tortious wrong.")

the contract," *Sherman v. Weber Dental Mfg. Co., supra,* 285 F.Supp. at 116, even if *Sherman* was such a case. Accordingly, the motion to dismiss count IV as to defendant Camp Trails will be denied.

With respect to Johnson Wax, which was not even a party to the 1966 contract, the issue is fairly straightforward. Inasmuch as I have already dismissed the breach-of-contract claims in counts I and II as to Johnson Wax, it plainly cannot now argue that the rule of *Glazer v. Chandler* shields it from tort liability for interference with business relations. The motion to dismiss count IV as to Johnson Wax will therefore be denied.

### MAGUIRE/LEMAY's MOTION TO DISMISS

█ Maguire/Lemay Associates, which is named as a defendant only in count IV, moves to dismiss the complaint as to it on the grounds of lack of jurisdiction, insufficiency of process, and failure to state a claim. Fed.R.Civ.P. 12(b). I conclude that dismissal for lack of jurisdiction is required, and thus I need not address the other contentions.

From the outset, Maguire/Lemay sought to have the jurisdictional issue determined prior to trial. Fed.R.Civ.P. 12(d). Ample time has been afforded both parties for discovery relating to jurisdiction, and Maguire/Lemay has submitted three affidavits executed by its president, Richard P. Lemay. Plaintiff has submitted no countervailing affidavits, and has advised the court by letter that it intends to submit none. (Letter from Ralf E. Gilbert, Esquire, dated March 14, 1978.) Plaintiff has also advised the court that it will not depose Mr. Lemay, although I recently granted plaintiff additional time for discovery to enable it to do so. *Id.* Finally, both parties presented their positions on the jurisdictional issue at oral argument. The issue is thus ripe for resolution on the present record.

Maguire/Lemay is a Massachusetts corporation, with its principal place of business in Massachusetts. Complaint ¶ 1(d). Plaintiff apparently sought to obtain *in person-am* jurisdiction over Maguire/Lemay by serving the summons and complaint in this action on the Pennsylvania Department of State, pursuant to the Pennsylvania "long-arm" statute. *See generally* 42 Pa.Cons. Stat.Ann. § 8302(a) (Purdon Supp.1977); Fed.R.Civ.P. 4(e). "Because there is no federal personal jurisdiction statute, personal jurisdiction is challenged by an attack on service of process." *B. J. McAdams, Inc. v. Boggs,* 426 F.Supp. 1091, 1096 (E.D.Pa. 1977). This motion thus presents the question whether Pennsylvania's "long-arm" statute reaches Maguire/Lemay.

The Pennsylvania "long-arm" statute provides in pertinent part:

"Any foreign corporation which shall have done any business in this Commonwealth without procuring a certificate of authority to do so from the Department of State as required by statute, shall be conclusively presumed to have designated the Department of State as its true and lawful attorney authorized to accept, on its behalf, service of process in any action arising within this Commonwealth."

42 Pa.Cons.Stat.Ann. § 8302(a) (Purdon Supp.1977).

Section 8309 deals with the meaning of "doing business":

"§ 8309. Acts affecting jurisdiction

(a) General rule.—Any of the following shall constitute 'doing business' for the purposes of this chapter:

(1) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object.

(2) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.

(3) The shipping of merchandise directly or indirectly into or through this Commonwealth.

(4) The engaging in any business or profession within this Commonwealth,

whether or not such business requires license or approval by the Commonwealth or any of its agencies.

(5) The ownership, use or possession of any real property situate within the Commonwealth.

(b) Exercise of full constitutional power over foreign corporations.—In addition to the provisions of subsection (a) of this section the jurisdiction and venue of courts of the Commonwealth shall extend to all foreign corporations and the powers exercised by them to the fullest extent allowed under the Constitution of the United States."

42 Pa.Cons.Stat.Ann. § 8309 (Purdon Supp.1977).

As Judge Ditter has pointed out, section 8309(b)

"eliminates the need to engage in the type of dual-tiered analysis which has typically been used in deciding questions of personal jurisdiction. Instead of first determining whether a foreign corporation's contacts with the forum fall within the terms of the applicable statute, and, if so, then determining if the statute as so applied comports with due process, courts in Pennsylvania may now proceed directly to the constitutional issue."

*Inpaco Corp. v. McDonald's Corp.*, 413 F.Supp. 415, 418 (E.D.Pa.1976).

The constitutional issue here is whether Maguire/Lemay has sufficient contact with Pennsylvania "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see, e. g., Empire Abrasive Equip. Corp. v. H. H. Watson, Inc.*, 567 F.2d 554, 557–58 (3d Cir. 1977), quoting *Jonnet v. Dollar Sav. Bank*, 530 F.2d 1123, 1140 (3d Cir. 1976) (Gibbons, J., concurring); *General*

*Heat & Power Co. v. Diversified Mortgage Investors*, 552 F.2d 556, 559 (3d Cir. 1977).[5]

Without belaboring the point, Maguire/Lemay's contact with Pennsylvania is quite plainly insufficient to sustain the jurisdiction of a Pennsylvania forum. Indeed, the *only* contact alleged in the complaint—that Maguire/Lemay acted as a distributor for Pennsylvania principals and made sales to customers residing in Pennsylvania—is explicitly negated by the most recent affidavit of Richard P. Lemay (Document No. 21, ¶¶ 1, 2, 4, which plaintiff, through the aforementioned letter of counsel, now accepts as true. The Lemay affidavit also states that Maguire/Lemay "has never made a sale or offered to sell or made a delivery within the Commonwealth of Pennsylvania," and that Maguire/Lemay "has never done, transacted, carried on or engaged in any business activity whatsoever within the Commonwealth of Pennsylvania." Lemay Affidavit (Document No. 21) ¶¶ 3, 5. Finally, the same affidavit states that Maguire/Lemay "has no knowledge of ever having made a sale *outside of* the Commonwealth of Pennsylvania to any resident of the Commonwealth of Pennsylvania." *Id.* ¶ 4 (emphasis supplied). Inasmuch as the plaintiff accepts the veracity of these sworn statements and offers no evidence of any other contact with Pennsylvania that might sustain this court's jurisdiction over Maguire/Lemay, the motion to dismiss for lack of jurisdiction must be granted.

## CONCLUSION

In summary, then, counts I and II of the complaint will be dismissed as to Johnson Wax for failure to state a claim, and the complaint will be dismissed as to Maguire/Lemay for lack of jurisdiction. In all other respects, the motions to dismiss will be denied.

---

**5.** The second aspect of the *International Shoe* due process test—the requirement that the forum state have some interest, "rationally connected with public policy," in adjudicating the dispute—is easily satisfied here by the allegation that George A. Davis, Inc., a Pennsylvania corporation, has suffered economic harm as a result of the defendants' tortious conduct. *Jon-*

*net v. Dollar Sav. Bank, supra*, 523 F.2d at 1140 (Gibbons, J., concurring); *see Empire Abrasive Equip. Corp. v. H. H. Watson, Inc., supra* (action by Pennsylvania corporation against nonresident corporate defendants for wrongful revocation of credit letter and breach of purchase contract).